JAMES M. JAEGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jaeger v. Commissioner
Docket No. 4679-71
United States Tax Court
T.C. Memo 1973-151; 1973 Tax Ct. Memo LEXIS 136; 32 T.C.M. (CCH) 732; T.C.M. (RIA) 73151; July 10, 1973, Filed William J. Mulligan, for the petitioner. James L. Norris, for the respondent. Sterrett
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in petitioner's income tax for the year 1967 in the amount of $219.28. The deficiency arises from the fact that respondent has included in petitioner's income the sum of $1,096 which petitioner asserts is exempt in its entirety from tax under section 117 of the Internal Revenue Code of 1954. [1] 2 FINDINGS OF FACT James M. Jaeger (hereinafter the petitioner) *137 resided at 1029 East Knapp Street, Milwaukee, Wisconsin at the time of filing his 1967 income tax return. He was also a resident of Milwaukee, Wisconsin at the time of the filing of the petition herein. He filed his Federal income tax return, Form 1040A, for the taxable year ended December 31, 1967, with the district director of Internal Revenue, Milwaukee, Wisconsin. From September, 1965 to June, 1972 petitioner was a teacher at Roosevelt Junior High School which is a school located within the Milwaukee Public School System, Milwaukee, Wisconsin. During the summer of 1967 petitioner was a graduate student at the University of Wisconsin, Milwaukee, working towards a masters degree in education. He received 6 credit hours, 3 in Community Resources and 3 in Education Philosophy, for his participation in the Central City Teacher-Community Project, which was used to help satisfy the 30 credit hours curriculum for the masters degree in education. He received his masters degree in education in June, 1971. He is currently a full time student at the University of Pennsylvania Graduate School of Education pursuing a doctorate in education curriculum. Petitioner received $1,096 in *138 1967 from the Cooperative Educational Service Agency No. 19 (hereinafter CESA 19) for his participation in the Central City Teacher-Community Project, and he did not include this $1,096 in his Federal income tax return for 1967. 3 CESA 19 is an educational service unit between the local school district and the state superintendent of schools created by section 39.51 of the Wisconsin Statutes which provides special educational services to teachers, students, school boards, administrators and others. CESA 19 was authorized to participate in Public Law 89-10, which funded the Central City Teacher-Community Project, on January 15, 1966. The state of Wisconsin supplies $29,000 annually toward the operation of each CESA. The agency also receives some funds through contracts with school districts and counties. When requested, specialized services are performed. Each CESA in Wisconsin is governed by a board of control of eleven members chosen by and from the school boards of the district within it, not more than one member from any district.The board of control chooses a coordinator or chief executive officer. The board of control and coordinator periodically call meetings of *139 the chief administrators of the school districts for advice and suggestions regarding services which the agency should perform. The geographic area of CESA 19 consists of 25 school districts in Milwaukee and Ozaukee counties. It includes enrollment in public and nonpublic schools. Its staff consists of the coordinator, 1 1/2 professional workers and two clerical workers. 4 CESA 19 made application for funding the Central City Teachers-Community Project to the U. S. Department of Health, Education and Welfare, Office of Education (hereinafter H.E.W.) pursuant to the provisions of Title III of the Elementary and Secondary Education Act of 1965, the aforenoted Public Law 89-10. 1966-67 Inner City Teachers Demonstration Project was a pilot and forerunner for the 1967-68 Central City Teacher-Community Project, designed to reduce school alienation of students and families in the Robert Fulton Junior High School. The project was an ongoing program to develop Milwaukee, Wisconsin's inner core areas, the most depressed part of metropolitan Milwaukee. The project was an informal cooperative relationship among the University of Wisconsin-Milwaukee, CESA 19, representatives from *140 the inner core and larger metropolitan Milwaukee community, and the Milwaukee Public Schools. The project was premised on the conviction that, in order to reduce alienation of the children and their parents to the school, there had to be intensive work with the families and teachers, so as to build understanding and confrontation of concrete scholastic, social and emotional problems in the family. The project objectives were: a. To ungrade the academic preparation, community sensitivity, and communication skill of fifteen selected teachers presently at Robert Fulton Junior High School or 5 who would be assigned to that school in September, 1966. b. To upgrade the desire and the ability of children of 150 families attending Fulton School to reap maximum benefits from the educational programs of the school, and other opportunities in the community. c. To upgrade interest of the parents in opportunities offered by the school and other agencies for their children and also for themselves. This includes developing understanding of ways and means of parent access to school staff through parent-teacher and other communication channels. d. To design, test and demonstrate *141 methodology for implementation of the above objectives by utilizing specialized resources of the University of Wisconsin-Milwaukee, the Milwaukee Public School System, the neighboring community, and any other relevant resources. The teachers were selected on the value that their training and experience would bring to the school, the community, and the research possibilities of the project. Only teachers who signed an application statement subjected to the following conditions were considered: a. Accept no other remunerative employment during the 8-week program. b. Commit themselves full time to the project. No less than one-half of the full-time commitment must be devoted to field work as described above. 6 c. Remain at Robert Fulton Junior High School for 2 years unless transferred by the school administration. d. Return for a similar project in Summer 1967 if the project is renewed. e. Participate in a 10-week seminar during each semester the 1966-67 school year for continuing evaluation of the project. f. Assist the principal of Robert Fulton Junior High in developing the community sensitivity of the Fulton faculty; particularly with teachers newly *142 assigned to the school.
g. Participate in a preliminary orientation and research session to be held at a mutually agreeable time prior to June 20. Each teacher desiring to participate in the 1967 program submitted an application and biographical information in order to be considered to participate in the program. The funding for the 1967 program was secured through three agencies: CESA 19 (through a continuation of funding by the Department of Health, Education and Welfare), the University of Wisconsin Extension and the University of Wisconsin-Milwaukee. The formal academic phase of the program for 1967 consisted of lectures, reading assignments and discussion groups. Each morning participants met at the University of Wisconsin-Milwaukee for the formal academic phase of the program. Each 7 project participant was expected to devote a minimum of four hours per week to activities directly related to his major school assignment. This was done through curriculum groups. During the project, however, teachers were permitted to withdraw from the formal groups to work in areas in which they felt a personal concern. There were no classroom teaching assignments involved *143 for the participants in the 1967 program. The field of petitioner's work involved approximately 9 students throughout the summer and, considering other family members in addition to the student, the participants' contracts included 50 people. The field work with the students and families was the heart of the project. The teachers spent no less than 20 hours per week in direct contact with students and families. The "field work" consisted of unstructured personal contacts between the participant and each of 10 families to whom the participant was assigned for purposes of the program. Petitioner and the other participants were directed to submit a "contact card" each time a contact was made. The participant could take the student to a library to get a card, take him fishing, go to the "Y", enroll girls in a Sears' Charm School, play softball, held a parent find a job or virtually anything else. The family contacts often meant a trip or an activity, 8 either alone, with the teacher, with other students assigned to the same teacher. Some additional activity during the school year was contemplated, but it was subsequently made optional. The purpose of the field work was *144 to give the participants a better understanding of the people of their school community. Increased understanding, it was felt, would result in increased ability to communicate with the students in the school and in their classes. This field work had a second basic purpose. It was hoped that the individual contact between teachers and parents would reduce the alienation which the many years of noncommunication had developed. Contacts with students and families were facilitated by community representatives employed by or volunteers for community service agencies. CESA 19 did not make any deposits to the public employees' social security fund for the teacher participants. No taxes of any kind were withheld. The 1967-68 Central City Teacher-Community Project was a continuation and based on the 1966-67 Central City Demonstration Project. The Milwaukee Public School System felt Public Law 89-10, which was funding the Central City Teacher-Community Project for 1967-68, was a federal program that reached into the home on a large scale and involved the parents and children. It was in this area that the program had its greatest strength, because 9 the fact was that many of *145 the problems and misunderstandings in the Central City resulted from a lack of understanding on the part of both the school and the home. At the April 4, 1967 meeting of the staff on the 1967-68 Central City Teacher-Community Project, it was stated that the project was primarily a project for service to Milwaukee City Schools. The monies paid by CESA 19 to the petitioner, and all other participants in the Central City Teacher-Community Project, for the summer of 1967, were described as wages for the performance of a very valuable service.
The University of Wisconsin-Milwaukee considered the Central City Teacher-Community Project as resulting in substantial educational benefits for the community, and thus continued its participation in the project. Petitioner executed a contract with CESA 19, the Milwaukee Public Schools, and the University of Wisconsin-Milwaukee which allowed him to participate in the Central City Teacher-Community Project. Petitioner's contract required him to remain at Roosevelt Junior High School for the next two school years, 1967-68 and 1968-69, required him to commit himself full time to the project from June 19 through August 11, 1967, required *146 him to make systematic contact with the students and families assigned for 10 the summer phase during the following school year, required him to participate in the orientation of new teachers during the next two years, 1967-68 and 1968-69, and required him to release to the Project Staff, for the purposes of selection and necessary research, his experience and training records including those on file in the Milwaukee Public School Teacher Personnel Office, and to supply requested information. The criteria for selection to participate in the 1967-68 Central City Teacher-Community Project was employment in the Milwaukee Public School System and the value that his training and experience would give to the community, to the school, and for research possibilities. OPINION Did petitioner receive the sum of $1,096 in 1967 "as a scholarship" or "as a fellowship grant" within the purview of section 117(a) (1) of the Code. [2] If the answer to the question is in the affirmative then petitioner owes no Federal income tax with respect to that amount; if the answer is in the negative then petitioner owes $219.28 in income tax. *147 11 Any consideration of section 117 may appropriately start with reference to the decision of the United States Supreme Court in Bingler v. Johnson, 394 U.S. 741 (1969). In elaborating on the characteristics of what is ordinarily understood as a scholarship or fellowship the Court called attention to the typical absence of any element of "strings-attached" to the payments in question. A promise to return to the employment of the payor of tuition expenses is not, the Court held in that case, a no-strings arrangement. It is a "quid" for a future "quo". In reaching its conclusion the Supreme Court sustained the respondent's Regulations which, in a pertinent part, provide: Section 1.117-4. Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * &c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of section 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, *148 if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. [Emphasis Supplied] 12 Turning to the petitioner herein we note that he contracted to participate in the Central City Teacher-Community Project during the summer of 1967 for an agreed sum of money and to remain "at the school to which I am presently assigned for the 1967-68 and 1968-69 school years unless transferred by my administrative superiors". Surely there was a benefit to those responsible for running the public schools of Milwaukee. It cannot be gainsaid that part of the purpose of the program was to improve the ability of those teachers involved to communicate with their students. To the extent that the program was successful petitioner improved himself in his work, and made himself a more effective teacher. However, there is nothing inconsistent in the foregoing with a holding that the amount in issue was for services *149 rendered and/or to be rendered. Hopefully all of us on salaries are improving in our line-of-work each day, but that does not convert our paychecks from amounts paid for services given to scholarships or fellowships given solely for self-improvement. The payments were made pursuant to a program, funded by the Federal Government but administered by a local agency, designed to improve the quality of education for school children in the inner city. The program was an appropriate part of the very purpose of the Milwaukee public school system, namely the education of children. Under such circumstances it 13 is not possible to say that the amounts paid were not for the benefit of the grantor-payor. That petitioner may have been matriculating at a local University as a candidate for a masters degree in education and that he may have received some credit hours towards the degree for his participation in the program does not mean that the payments were not made for the benefit of the public school system. That the school system felt benefited by his involvement in the program is apparent from the fact that, to be involved, he had to agree to teach for 2 succeeding years in the *150 system. Under the facts of this case we have no hesitancy, despite the effective presentation of petitioner's view, in holding for respondent and finding the sum in question taxable to petitioner. Decision will be entered for the respondent. Footnotes
1. All references to the Code are to the Internal Revenue Code of 1954. ↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e) (4)), or (B) as a fellowship grant, including the value of contributed services and accommodations; * * *. ↩